## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:21-cr-00156 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| Zaekwon MCDANIEL, Tahjay LOVE, | ) | |
| Malik BAYON. | ) | |
| | ) | APRIL 15, 2025 |

<u>MEMORANDUM OF DECISION</u>
### RE: MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL (ECF NOs. 666, 672, 673, 695, 748, 749, 974)

Kari A. Dooley, United States District Judge:

Following a jury trial, Defendants Zaekwon McDaniel ("McDaniel"), Tahjay Love ("Love") and Malik Bayon ("Bayon", collectively "Defendants") were found guilty of racketeering conspiracy in violation of 18 U.S.C. § 1962(d), including the special sentencing factor of murder with special circumstances in violation of Conn. Gen. Stat. §§ 53a-54b(7) and 53a-8(a) (Count One); two counts of Violent Crime (murder) in aid of racketeering ("VCAR murder") in violation of 18 U.S.C. §§ 1959(a)(1) and 2 and Conn. Gen. Stat. §§ 53a-54a and 53a-8a (Counts Four and Five); and two counts of causing death through the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1) and 2 (Counts Six and Seven).

In addition, McDaniel was found guilty of attempted murder and assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2 and Conn. Gen. Stat. §§ 53a-54a, 53a-59(a)(5), 53a-49 and 53a-8(a) (Count Eight), and carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. 924(c)(1)(A)(i), (ii), (iii), and 2 (Count Nine); Love was found guilty of obstruction of justice in violation of 18 U.S.C. § 1503 (Count Twenty-Five); and Bayon was found guilty of conspiracy to possess with intent to

distribute and distribution of 100 grams or more of heroin or 40 grams or more of fentanyl in violation of 21 U.S.C. § 846 (Count Twenty-Six), possession with intent to distribute heroin or fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count Thirty), and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2) (Count Thirty-Four).

Pending before the Court are McDaniel, Love, and Bayon's post-trial motions for judgment of acquittal and/or a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.

**Procedural History**

On September 14, 2021, a federal grand jury returned a thirty-six count Indictment against sixteen defendants, including McDaniel, Love, and Bayon, for conduct related to the activities of the street gang "960" in Waterbury, Connecticut. Defendants were charged in the following counts:

McDaniel, Love, and Bayon:

- Count One, racketeering conspiracy in violation of 18 U.S.C. § 1962(d), including the special sentencing factor murder with special circumstances in violation of Conn. Gen. Stat. §§ 53a-54b(7) and 53a-8(a), for the deaths of Clarence Lewis and Antonio Santos on November 22, 2017;

- Count Four, VCAR murder in violation of 18 U.S.C. §§ 1959(a)(1) and 2 and Conn. Gen. Stat. §§ 53a-54a and 53a-8a, for the death of Clarence Lewis on November 22, 2017;

- Count Five, VCAR murder in violation of 18 U.S.C. §§ 1959(a)(1) and 2 and Conn. Gen. Stat. §§ 53a-54a and 53a-8a, for the death of Antonio Santos on November 22, 2017;

- Count Six, causing death through the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1) and 2, for the death of Clarence Lewis on November 22, 2017;

- Count Seven, causing death through the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1) and 2, for the death of Antonio Santos on November 22, 2017.

McDaniel:

- Count Eight, attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2, and Conn. Gen. Stat. §§ 53a-54a, 53a-59(a)(5), 53a-49, and 53a-8(a), for the shooting of Jermaine Smith, Sr. on December 29, 2017; and

- Count Nine, carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and 2, for the shooting of Jermaine Smith Sr. on December 29, 2017.

Love:

- Count Twenty-Five, obstruction of justice in violation of 18 U.S.C. § 1503, for the assault of John Aspilaire on or about October 19, 2019.

Bayon:

- Count Twenty-Six, conspiracy to possess with intent to distribute and distribution of 100 grams or more of heroin or 40 grams or more of fentanyl from approximately June 2018 to February 2020, in violation of 21 U.S.C. § 846;

- Count Thirty, possession with intent to distribute heroin or fentanyl on or about November 15, 2019, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2;

- Count Thirty-Three, felon in possession of a firearm on or about November 15, 2019, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and

- Count Thirty-Four, possession of a firearm in furtherance of a drug trafficking offense on or about November 15, 2019, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2).

Several defendants elected to be tried by a jury. The Court severed the defendants into two trial groups, and McDaniel, Love, and Bayon were tried together, along with codefendant James Graham. *See* ECF No. 489. On November 29, 2023, Bayon moved to dismiss Count Thirty-Three, challenging the constitutionality of 18 U.S.C. Section 922(g)(1) following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). On December 21, 2023, the Court severed and stayed Count Thirty-Three, pending an anticipated ruling on the issue from the Second Circuit. *See* Mot. to Dismiss Count Thirty-Three, ECF No. 496; ECF No. 584. Jury selection was held on January 3 and 4, 2024. The jury heard evidence over the course of twenty-three days, commencing on January 5, 2024, and on February 14, 2024, returned guilty verdicts as to all Counts against all Defendants.

Defendants orally moved for Judgment of Acquittal on February 5, 2024, *see* ECF No. 666, and renewed their motions on February 7, 2024. *See* ECF Nos. 672, 673; Feb. 7 Trial Tr., ECF No. 740 at 100:25–101:10. Defendants then timely filed the written motions and memoranda in support of their motions as follows:

McDaniel: [1]

- Motion for Acquittal/New Trial ("McDaniel Mot."), ECF No. 748;

- Memorandum in Support ("McDaniel Mem."), ECF No. 972

Love: [2]

- Motion for Judgment of Acquittal and for New Trial ("Love Mot."), ECF No. 695.

- Renewed Mot. for Judgment of Acquittal and for New Trial ("Renewed Love Mot."), ECF No. 974

Bayon: [3]

- Motion for Judgment of Acquittal/New Trial ("Bayon Mot."), ECF No. 749

- Memorandum in Support ("Bayon Mem."), ECF No. 973

The Government filed an omnibus opposition to Bayon's, McDaniel's, and Love's post-trial motions and memoranda on October 14, 2024. *See* Gov. Opp'n, ECF No. 1111.

**Standard of Review—Motion for Judgment of Acquittal**

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the

---

[1] McDaniel also filed a motion to adopt the arguments made by his codefendant Bayon in support of a judgment of acquittal and for a new trial. *See* McDaniel's Mot. to Adopt, ECF No. 977. The Court granted McDaniel's motion on June 18, 2024, ECF No. 984, and so will consider Bayon's arguments when adjudicating McDaniel's motion, to the extent that they are applicable.

[2] Love's first written motion for judgment of acquittal, at ECF No. 695, sought only to preserve his rights and requested a later date on which to file memoranda in support. In his second motion at ECF No. 974, Love does not independently advance any arguments, but instead adopts his co-defendant Graham's arguments with respect to Count Twenty-Five (obstruction of justice) and McDaniel's and Bayon's arguments with Respect to Counts One (racketeering conspiracy and murder with special circumstances), Four and Five (VCAR murder), and Six and Seven (causing death through the use of a firearm). *See* Renewed Love Mot., ECF No. 974. The Court will consider McDaniel's, Bayon's, and Graham's arguments when adjudicating Love's motion, to the extent that they are applicable.

[3] Bayon also filed a supplemental memorandum in support on the same day as his primary memorandum, in which he moved to adopt the arguments advanced by co-defendant McDaniel in his memorandum at ECF No. 972. *See* Bayon's Suppl. Mem., ECF No. 975. The Court will consider McDaniel's arguments when adjudicating Bayon's motion, to the extent that they are applicable.

defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Id.* "When making a case based on circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (citation and internal quotation marks omitted).

**Standard of Review—Motion for a New Trial**

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29,

but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "In other words, there must be a real concern that an innocent person may have been convicted" for the ordering of a new trial to be appropriate. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up). With these legal principles in mind, the Court turns to the merits of Defendants' motions. In doing so, the Court will discuss the evidence at trial as necessary to address the issues raised by the defendants.

**Discussion**

Preliminarily, the Court observes that none of these defendants advances any argument as to the sufficiency of the evidence on Count One, the RICO Conspiracy charge. The defendants' arguments as to Count One are limited to, and directed at, the jury's conclusion that they committed murder with special circumstances in furtherance of the RICO Conspiracy. The same arguments are advanced as to the VCAR murder charges (Counts Four and Five) and the § 924(j) charges (Counts Six and Seven), which all stem from the murders of Clarence Lewis and Antonio Santos. As such, even if the Rule 29 motion is granted as urged with respect to Count One, the conviction on Count One would stand. The defendants' maximum exposure, however, would be reduced from mandatory life to as little as 20 years of incarceration.

Similarly, Bayon advances no argument challenging his conviction for, or seeking a new trial with respect to, Count 26, conspiracy to distribute 100 grams or more of heroin and 40 grams or more of fentanyl; Count 30, possession with intent to distribute heroin and fentanyl; or Count 34, using and carrying a firearm in furtherance of and relation to the narcotics conspiracy charged in Count 26.[4]

Finally, McDaniel advances no argument challenging his conviction for, or seeking a new trial with respect to, Count Eight, attempted murder and assault with a dangerous weapon in aid of racketeering related to the shooting of Jermaine Smith Sr; and Count Nine, carrying and using a firearm during and in relation to the crime of violence charged in Count Eight.[5]

Accordingly, except as may be necessary to address the arguments advanced by Defendants, the Court does not detail the evidence offered as to these unchallenged convictions. The Court begins by reviewing the overwhelming evidence supporting the jury's verdict on Count One in summary fashion to provide context for the murders of Lewis and Santos.[6]

The jury could have easily concluded that the Defendants were self-identified members of a street gang known as "960," which originated in and around the Long Hill Projects of Waterbury Connecticut. Jan. 18 Trial Tr., AM, ECF No. 713, at 98:5–105:15. An earlier incarnation of the gang was called "1920" but it became 960 (half of 1920) when some of the older members of the

---

[4] As to Count 26, Bayon faces a mandatory minimum period of incarceration of 5 years and a maximum period of incarceration of 40 years. 18 U.S.C. §§ 841(b)(l)(B). As to Count 34, Bayon faces a possible life sentence and a mandatory minimum period of incarceration of 5 years which must be imposed to run consecutive to the sentence imposed in Count 26. 18 U.S.C. § 924(c). As to Count 30, Bayon faces a maximum period of incarceration of 20 years. 18 U.S.C. § 841(b)(1)(C) In the aggregate, on these three charges, Bayon faces a maximum period of incarceration of life plus 60 years and a mandatory minimum period of incarceration of 10 years.

[5] As to Count Eight, McDaniel faces a 20-year period of incarceration. 18 U.S.C. § 1959(a)(3). As to Count 9, McDaniel faces a possible life sentence and a mandatory minimum period of incarceration of 10 years, which must be imposed to run consecutive to any sentence imposed for Count Eight. 18 U.S.C. §§ 924(c)(1)(A)(iii), (D)(ii). In the aggregate, for these two charges, McDaniel faces a maximum period of incarceration of life plus 20 years, of which 10 years is a mandatory minimum.

[6] By citing to specific evidence in the record, the Court does not suggest that the evidence cited is the only evidence supporting the jury's conclusion on a particular allegation. The citations are exemplars only.

gang began to pull back and move on. *Id.* 960 had a logo or brand of sorts which featured a firearm and a ski mask as part of the "960" image. Jan. 18 Trial Tr., PM, ECF No. 714 at 34:25–35:5. The logo was worn on clothing and used in the production of professionally made rap videos. *See, e.g.*, Gov. Ex. ("GX") 41B. The jury saw "The 960 Story" among other rap videos which featured McDaniel, Love, Bayon and others identified as members of 960. GX 41; Jan. 18 Tr., PM, at 27:2–38:11. Many members had "960" tattoos, to include Defendants Love and McDaniel. *Id.* at 37:2–7; Jan. 19 Trial Tr., ECF No. 715, at 26:13–24. 960 members used hand signs and a particular handshake to communicate their allegiance to the gang. Jan. 18 Tr., AM, at 108:11–25.

Law enforcement witnesses identified each of the Defendants as known members of 960. Jan. 8 Trial Tr., AM, ECF No. 700, at 78:3–80:22. Jermaine Gilbert, a former 960 member and cooperating witness, identified each of the Defendants as members of 960. Jan. 18 Tr., AM, 115:7–118:6. Gilbert testified that 960 members distributed narcotics, stole motor vehicles and used stolen vehicles to commit acts of violence against rival gangs. *Id.* at 100:6–101:13; Jan. 18 Tr., PM, at 11:4–19. Two such rival gangs were "ATM," which was associated with the Brooklyn section of Waterbury, i.e. the intersection of Bank Street and Porter Street, and "The Ave Boys" generally associated with the area of Walnut Avenue and Walnut Street. Jan. 18 Tr., AM, at 129:9–133:14; Jan 18 Tr., PM, at 10:1–24. As discussed in greater detail below, Gilbert testified regarding his and others' involvement in multiple shootings. *See, e.g.*, Jan. 18 Tr., AM, at 110:17–25.

The jury heard extensive testimony regarding narcotics trafficking by 960 members, to include an undercover purchase from members Ezra and Ahmad Alves. Jan. 29 Trial Tr., PM, ECF No. 728, at 76:6–80:15. The jury heard the testimony of a former narcotics "customer" who testified that he purchased narcotics from 960 members Gabe Pulliam, Ezra Alves and others. Jan. 30 Trial Tr., PM, ECF No. 730, at 104:18–23; Jan. 31 Trial Tr., AM, ECF No. 731, at 19:11–21:25.

This witness testified that while he always called the same number to arrange a purchase, the phone was answered by a variety of individuals, demonstrating that 960 members shared a drug phone. Jan. 31 Tr., AM, at 22:2–16.

In sum, the evidence regarding the existence of 960 as a racketeering enterprise in and affecting interstate commerce;[7] the extent to which the enterprise engaged in a pattern of racketeering activity; and the defendants' membership therein was overwhelming. None of these defendants argues otherwise.

*The Murders of Lewis and Santos*

The special sentencing factor in Count One and Counts Four, Five, Six and Seven, are premised upon the Defendants' participation in the murders of Lewis and Santos. Each challenges the sufficiency of the evidence in this regard. They argue that the evidence of their involvement was not credible on its face and that the shooting of Lewis was not the proximate cause of either death. The Defendants also advance several challenges to the "murder with special circumstances" statute charged with respect to Count One; for example, that it is void for vagueness.

**The Evidence at Trial**

The jury heard testimony and viewed evidence in the form of rap videos and photographs that demonstrated that Lewis and Santos were members of rival gang ATM. *See, e.g.*, Jan. 18 Tr., PM, at 7:17–8:5, 62:6–63:8; GXs 46A, 47. ATM and 960 used social media, e.g. Facebook, to taunt and mock each other. *See, e.g.*, Jan 18 Tr., PM, at 69:21–23, 83:23–84:4. Both gangs would post rap videos directed at the other. *Id.* at 75:23–76:16; Feb. 5 Trial Tr., AM, ECF No. 736, at 101:4–101:8. Members of each gang would follow members of the other on social media platforms

---

[7] Although not required to prove the existence of the racketeering enterprise in the conspiracy context, as the Court instructed the jury, the existence of the enterprise is highly probative evidence as to the existence of the conspiracy. Jury Instructions, ECF No. 687 at 21.

to monitor each other's activities. *See, e.g.,* Jan. 18 Tr., PM, at 79:23–80:17; Feb. 5 Tr., AM, at 68:5–69:3

Jermaine Gilbert, a former 960 member and cooperating witness, testified that prior to the night in question, he and McDaniel, both armed (he with a gun provided by McDaniel), had driven around Waterbury looking for Lewis because Lewis had pointed a gun at McDaniel. Jan. 19 Tr., AM, at 53:2–57:22; 60:18–61:6. Although they did not find Lewis, they did come across a different individual with whom McDaniel had a dispute. *Id.* at 58:19–59:24 They then exited the vehicle they were in and shot at this person. *Id.* at 61:18–62:25. Afterward, Gilbert returned the firearm he had used to McDaniel. *Id.* at 64:24–65:3.

Later, a few days before the deaths of Lewis and Santos, Gilbert testified that he was in his car, stopped at a red light. *Id.* at 68:9–69:1. A vehicle pulled next to him and the passenger window was lowered. *Id.* Lewis was driving the vehicle. *Id.* Lewis raised a firearm and pointed it at Gilbert. *Id.* at 71:16–74:8. No shots were fired. *Id.* Gilbert then went to the Long Hill Projects to try to get the firearm from the previous shooting from McDaniel. *Id.* at 74:9–75:23. However, when he got to the Long Hill Projects, McDaniel told him he had given the gun to co-Defendant Graham ("Lil Cuz"). *Id.* at 76:1–78:16.

A few days later, on November 21, 2017, approaching midnight, Gilbert was at Wendy's on Wolcott St. in Waterbury. *Id.* at 79:5–21. He saw Lewis's car entering the Wendy's lot. *Id.* at 79:15–80:3. Gilbert called McDaniel and told him Lewis was at the Wendy's and acting strange. McDaniel told him to "be safe." *Id.* at 82:21–87:6. Gilbert left the area, stopped at a corner store near his home, and then went to his home on Farragut Street. *Id.* at 87:10–89:10.

The jury also heard evidence that not long after midnight on November 22, 2017, a black Volvo, travelling at a high rate of speed hit (and severed) a utility pole before crashing into a house

near the intersection of Wolcott and Dallas Avenue. *See generally* Jan. 17 Trial Tr., PM,  ECF No. 712, at 98:12–108:1; GX 200, 208. The crash scene was approximately .7 miles from the Wendy's. Feb. 5 Trial Tr., AM, ECF No. 736, at 120:19–121:7. Lewis and Santos had been in the vehicle but were outside the vehicle at the scene of the crash. Jan 16. Trial Tr., AM, ECF No. 709, at 44:9–44:21; Jan 17 Tr. at 114:17–115:15. Both died at the scene. Jan 12. Trial Tr., PM, ECF No. 708 at 80:7–80:15. Lewis had been shot. Jan. 24 Trial Tr., PM, ECF No. 721 at 88:19–89:9; GX 209 at 8–9.

While the police were securing the scene, Richard Carey approached one of the officers on the perimeter. Jan. 16 Trial Tr., AM, ECF No. 709, at 16:18–17:20. He told the officer that during his regularly undertaken early morning walk, he located a magazine for a firearm on the ground in the Wendy's parking lot. *Id.* at 17:21–19:20. The magazine was secured as evidence. Jan. 12 Tr., PM, at 91:8–97:25; GX 219. The police then went to Wendy's as a potential secondary crime scene. Jan. 16 Tr., AM, at 32:16–33:11. They located and seized one 9 mm spent shall casing and five .40 caliber spent shell casings. *Id.* at 61:9–66:24; GX 217A–E, 218. They also located a gray Honda,[8] parked askew across several parking spots. *Id.* at 57:20–25; GX 201. The shell casings and the magazine were located close to the Honda. GX 201.

Gilbert further testified that approximately 20 to 30 minutes after he had spoken to McDaniel, McDaniel called him and told him to open the door to his apartment. Jan. 19 Tr., AM, at 93:7–24. When he did so, he saw McDaniel, Love and Bayon running down his street toward his apartment. *Id.* at 93:15–94:20. They went into Gilbert's bedroom, where they proceeded to put

---

[8] The Honda was later processed at the Waterbury Police Department garage and found to contain quantities of crack cocaine, heroin, and marijuana. The marijuana was in a plastic baggie located in the center console, while the crack cocaine and heroin were packaged in individual baggies and folds in a pocket on the driver's side door. Jan. 16 Trial Tr., PM, ECF No. 710, at 20:14–23:11; GX 206; GX 226. Based on this evidence the jury could reasonably infer that whoever had been driving the Honda was a drug dealer and possibly a gang member.

guns on the bed. *Id.* at 96:9–24. Gilbert described Bayon as looking shocked and "out of it." *Id.* at 95:2–11. Bayon told Gilbert "Cuz, he dead." Gilbert understood Bayon to be talking about Lewis. *Id.* at 95:12–96:6. He testified that Love was angry and called McDaniel a "dumbass" for dropping his "clip." Bayon complained that McDaniel had not fired enough bullets. McDaniel explained that the magazine fell out of his firearm. *Id.* at 96:9–15, 97:4–98:12. The Defendants told Gilbert that Lewis was "talking to a Honda" at the Wendy's; that Love had been the driver and that Bayon and McDaniel were the shooters. *Id.* at 98:23–99:17. The defendants told Gilbert to go to the Wendy's and retrieve the magazine. *Id.* at 101:15–102:5. Gilbert left and drove toward the scene but did not try to find or retrieve the magazine. *Id.* at 103:5–105:24. When he arrived at the Wendy's, there was no police presence (yet), and he left the area but could see the crash scene. *Id.* at 106:5–107:14. Gilbert returned home. He advised Bayon to urinate on his hands to get rid of any gunshot residue, which Bayon did. *Id.* at 107:23–109:12. Gilbert then insisted that they leave his apartment. *Id.* at 109:23–110:7.

Gilbert testified that his sister and his girlfriend Emani Holmes were present in the apartment. Jan. 23 Trial Tr., AM, ECF No. 718, at 129:11–130:12.

The jury heard evidence that McDaniel's DNA was discovered on the magazine found by Mr. Carey in the Wendy's parking lot. Jan. 30 Trial Tr., ECF No. 730, PM, at 55:7–24; GX1111. Phone records confirmed a call between Gilbert and a burner phone associated with McDaniel shortly before the shooting and crash.[9] Jan. 30 Trial Tr., AM, ECF No. 729 at 59:20–64:6; GX 211, 211B–E.

### Sufficiency of the Evidence—Defendants' Participation

---

[9] Cellphone extraction evidence and the records from the burner phone showed that the burner had been used to call McDaniel's father. Jan. 30 Tr., AM, at 74:8–75:17; GX 211, 211B–E.

The Court begins by assessing the threshold issue of whether there was sufficient evidence to establish the involvement of Bayon, McDaniel and Love in the deaths of Antonio Santos and Clarence Lewis. The Defendants argue, principally, that Gilbert's testimony was simply not credible and even demonstrated to be false by the testimony of Emani Holmes, the girlfriend Gilbert claimed was at his apartment on the night in question. She recalled no such event and believed she would have remembered people with guns arriving at the apartment. Feb. 7 Trial Tr., AM, ECF No. 740 at 52:18–53:14.[10]

As discussed above, the Court does not sit as a thirteenth juror. Credibility determinations are uniquely the province of the jury. *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). And the Court cannot conclude that no reasonable juror could have credited Gilbert's testimony. *See United States v. Williams-Bey*, No. 3:20-CR-00172-MPS, 2023 WL 5286799, at *6 (D. Conn. Aug. 17, 2023) (collecting cases). First, Gilbert was on the witness stand for five days and subject to rigorous and exhaustive cross-examination. The inconsistencies now detailed by Defendants were thoroughly highlighted during the cross-examination. Second, Gilbert's testimony included information as to his and other 960 members' involvement in numerous shootings. His testimony as to these other events (some of which will be discussed below) was corroborated, to varying

---

[10] In addition to the arguments surrounding Gilbert's reliability, Bayon argues that Shan Thompson's confession to having participated in the shooting further negates any finding that Bayon was involved. First, Shan Thompson was subject to extensive direct and cross examination regarding these admissions. *See generally* Feb. 6 Trial Trs., AM & PM, ECF Nos. 738–739. The jury could have credited his claim that these were false confessions which landed him in federal prison for making false statements to the FBI. Feb. 6 Tr., PM, at 58:12–60:3. More to the point however, Bayon's argument that Thompson "never once implicated Malik Bayon" in all of his confessions would have had little impact on the jury's assessment of this evidence. Bayon Mem. at 13. The jury did not hear, *because Bayon elected not to elicit*, that Thompson had in fact implicated others, specifically Love and McDaniel, but not Bayon. *See, e.g.,* Jan. 8 Trial Tr., AM, ECF No. 700 at 26:7–26:13; Jan. 31 Trial Tr., PM, ECF No. 732 at 131:11–23; Feb. 6 Tr., AM, at 51:8–51:18.

extents, by other witnesses, surveillance video, shell casings, social media posts, ballistic experts, DNA experts, phone extractions, and phone records.[11]

So too was his testimony regarding the murders of Lewis and Santos. Gilbert testified that McDaniel told him he dropped his magazine. The magazine retrieved at the scene had McDaniel's DNA on it. Gilbert testified that he called McDaniel and told him Lewis was at the Wendy's. Phone records reveal a call between Gilbert's phone and a burner phone clearly tied to McDaniel approximately ten minutes before the shooting.[12] Gilbert testified that Bayon was angry because he fired more shots than McDaniel. This is corroborated by the shell casings retrieved from the Wendy's parking lot. There was only one 9mm shell casing (which matched the rounds in the magazine with McDaniel's DNA on it)[13] but five .40 caliber casings, revealing a second shooter who fired more shots than the person with the 9mm firearm. McDaniel, in the hours and days following the murders, repeatedly searched the internet for information on Lewis. GX1161; Feb. 5 Trial Tr., AM, ECF No. 736, at 68:5–73:8. Further, Love told John Aspilaire that he was involved in the Santos and Lewis murders. Jan. 26 Trial Tr., AM, ECF No. 724, at 82:22–83:25. Indeed, Aspilaire's decision to share this information with the Waterbury Police Department led to his violent assault, which is the subject of the obstruction of justice charge in Count Twenty-Five. *See generally United States v. Graham*, No. 3:21-CR-00156 (KAD), 2025 WL 20525, at *6 (D. Conn.

---

[11] By way of a singular example only, Gilbert testified that McDaniel told him that he shot Jermaine Smith Sr. when he was taking out the trash. Jan. 19 Tr., AM, at 112:15–24. Mr. Smith Sr. is the father of rival gang member Jermaine Smith, Jr. In addition to other corroborative evidence, the jury saw pictures and videos taken with McDaniel's phone which were taken at the site of the shooting, and which were taken just minutes before the shooting. GX 309, 309A, 310, 310A, 311; Jan. 17 Trial Tr., ECF No. 711, AM, at 33:9–40:12.

[12] Phone records show that Gilbert's phone made a call to the burner phone associated with McDaniel at 11:53 PM on November 21, 2017. Jan. 30 Tr., AM, at 59:20–64:6; GX 211. Officer Federowicz, the first WPD officer to become aware of the shooting on Wolcott St., learned of it via a traffic stop "at approximately midnight." Jan. 12 Trial Tr., PM, ECF No. 708, at 56:16–59:22, 65:9–67:16.

[13] The unfired 9mm rounds in the magazine and the spent 9mm casing found in the Wendy's parking lot were both manufactured by Blazer, and were so stamped. Jan 16. Tr., AM, at 65:19–21; GX 218, 220.

Jan. 2, 2025). In sum, Gilbert's testimony in combination with the other evidence was sufficient for the jury to determine that Bayon, Love and McDaniel were involved in the deaths of Lewis and Santos.

### Sufficiency of the Evidence—Proximate Cause

The special sentencing factor in Count one, the VCAR Murders charged in Counts Four and Five, and the § 924(j) charges at Counts Six and Seven all required the jury to find, *inter alia*, that the defendants' conduct was the proximate cause of the deaths of Lewis (Counts One, Four, and Six) and Santos (Counts One, Five, and Seven).

As to the special sentencing factor in Count One, the Court instructed the jury on the elements of murder and aiding and abetting under Connecticut law. On the issue, of whether the defendant's conduct was the proximate cause of the deaths of Lewis and Santos, the jury was charged as follows:

> In this vein, the Government must prove beyond a reasonable doubt that the defendant proximately caused the deaths of Antonio Santos and Clarence Lewis. Proximate cause does not necessarily mean the last act or cause, or the act in point of time nearest to the death. The concept of proximate cause incorporates the principle that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the death.

> An act or omission to act is a proximate cause of the death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the death. It is a cause without which the death would not have occurred. It is a predominating cause, a substantial factor from which the death follows as a natural, direct and immediate consequence.

> It does not matter whether the particular kind of harm that results from the defendant's act be intended by the defendant. When the result is a foreseeable and natural result of the defendant's conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible.

> I'm next going to instruct you on the doctrine of intervening cause. The doctrine of intervening cause applies in a situation in which the defendant's conduct is a cause and factor of the death, that is, Mr. Santos or Mr. Lewis would not have died but for the defendant's conduct, but nonetheless something else subsequently

occurs – which may be an act of the decedent, the act of some other person, or some nonhuman force – that does more than supply a concurring or contributing cause of the injury. An intervening cause is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct. In such a case, the defendant's conduct is not the proximate cause of the death.

The doctrine of intervening cause serves as a dividing line between two closely related factual situations: 1) when two or more acts or forces, one of which was set in motion by the defendant, combine to cause a person's death, the doctrine of intervening cause will not relieve the defendant of criminal responsibility, and 2) when an unforeseeable act and force intervenes in such a powerful way as to become the proximate cause of the death, the doctrine of intervening cause will relieve a defendant from criminal responsibility, even though his or her conduct contributed, in fact, to the death.

In other words, when more than one factor contributes, in a chain of events, to cause death, in order to be the proximate cause of that death, the defendant's conduct must have been a cause that necessarily set in operation the factors that accomplished the death. When the other circumstance constitutes a concurring or contributing cause of the death, the defendant will be held responsible. When the other circumstance constitutes an intervening cause of the death, the defendant will not be held responsible.

Jury Instructions, ECF No. 687, at 24–26. The Court then referred the jury back to these instructions in connection with Counts Four and Five (VCAR Murder) *Id.* at 33–34. With respect to Counts Six and Seven, the jury was instructed that they would only reach the § 924(j) counts if they had already determined that the defendant committed the VCAR murder alleged in counts Four and Five. *Id.* at 38–39. Accordingly, the proximate and intervening cause charges were applicable as to Counts One, Four, Five, Six and Seven. And it is the sufficiency of the evidence on this issue on which the Defendants each challenge their convictions.

The Defendants argue, for a variety of reasons, that the evidence was insufficient to establish that the shooting of Lewis was a) the proximate cause of Lewis's death or b) the proximate cause of Santos's death. Each of their arguments is premised upon an interpretation of the evidence that the Defendants argued but which the jury clearly rejected. At this stage, the Court,

drawing all inferences in favor of sustaining the verdict, concludes that the jury could have found the shooting of Lewis to be the proximate cause of both deaths.

The evidence included multiple crime scene photos from the crash site and the Wendy's. *See* GX 200, 201. The forensic evidence included that the bullet that struck Lewis travelled into him on a downward angle, and lost enough kinetic energy that it did not exit his body, due to "either passing through tissues of the body or possibly passing through other intermediate objects…". Jan. 24 Tr., PM, at 94:2– 95:6. The path of a bullet that struck the Volvo travelled through the driver's seat on a downward angle. GX205 at 12. The driver's side of the vehicle had multiple bullet strikes. *Id.* at 1. The interior of the Volvo had blood on both sides of the front passenger area to include the driver's and front passenger's seats. *Id.* at 12–15. The jury could have easily concluded that Lewis was in the driver's seat at the time he was shot, and that the bullet that struck him may have been slowed by passing through the seat.

The Medical Examiner testified that Lewis died as a result of the gunshot wound and blunt force trauma from the crash. Jan. 24 Tr., PM, at 88:19–21. Dr. Vincent testified that the bullet entered Lewis's back travelling from left to right. *Id.* at 94:13– 95:6. The bullet struck and fractured the bone around Lewis's spinal column and caused a concussive effect on Lewis's spinal cord. *Id.* at 89:19–93:14. This in turn could have resulted in paralysis which would have occurred quickly if not instantaneously. *Id.* at 90:24–93:19. The Medical Examiner also testified that Santos died as a result of blunt force trauma in the crash. *Id.* at 100:4–101:2.

Defendants argue that Santos was not present at the time of the shooting; that he came upon the scene after the fact; that he quickly abandoned his car and drove Lewis's car (the Volvo) in an effort to save Lewis, and that through his reckless driving he caused the crash that killed them both. This, they argued, was an intervening cause that defeated any finding that the shooting was

18

the proximate cause of either death. While there was some evidence from which such a series of inferences might be drawn, and while the Defendants made this argument to the jury, Feb. 9 Trial Tr., AM, ECF No. 743, at 32:8–34:23, there was ample evidence that Santos was present when Lewis was shot, as was argued by the Government and apparently credited by the jury.

The Defendants told Gilbert that Lewis was "talking to a Honda," by inference Santos's vehicle left at the Wendy's and parked across multiple parking spots, when they encountered Lewis at the Wendy's. The magazine and shell casings were discovered in close proximity to the abandoned car.

The Government then argued that when the shots were fired, Santos and Lewis fled in the Volvo to escape the gunfire. Feb. 8 Trial Tr., ECF No. 742, PM, at 35:13–19. And although the Defendants and the Government disagree as to who was driving, as the Government explained at trial, and in opposition to the Defendants' motions, whether Lewis was driving or whether Santos was driving, the evidence supported a finding that the shooting was the proximate cause of both deaths. *Id.* at 30:7–31:21; Feb. 9 Trial Tr., PM, ECF No. 744, at 57:11–59:14; Gov. Opp'n at 31–32.

Scenario one (Argued by the Government)—Santos was either already in Lewis's car or jumped into Lewis's car when the shooting started. As Lewis sped away at a high rate of speed, the paralysis caused by the bullet damaging his spine, rendered Lewis unable to control the vehicle, causing it to crash. Feb. 9 Tr., PM, at 59:1–59:6. Thus, the Government argued, the shooting of Lewis was the proximate cause of both deaths. The Defendants do not argue otherwise insofar as their argument is premised upon Santos driving the Volvo at the time of the crash. As this scenario is supported by the evidence and the reasonable inferences to be drawn from the evidence, Defendants' proximate cause argument necessarily fails.

19

Notwithstanding, the Court examines scenario two—after he is shot while sitting in the driver's seat, Lewis manages, with or without Santos's help, to climb over the center console to get into the passenger seat. Santos then drives away in an effort to avoid the gunfire, loses control of the vehicle and crashes, resulting in both deaths. The government argued that the crash, regardless of who was driving, was reasonably foreseeable to the shooters. *Id.* at 59:7–59:14. As whoever was driving, it is reasonably foreseeable that "if you're being shot at, … you're going to speed away from the scene, run for your life as you're being shot at." Feb. 8 Tr, PM, at 30:21–24.

Ultimately, it was for the jury to determine whether the crash, even if Santos was driving at the time of the crash, was a reasonably foreseeable consequence of the shooting. The motion for judgment of acquittal based upon the sufficiency of the evidence as to the Special Sentencing Factor in Count One and Counts Four, Five, Six and Seven is denied.

### Intervening Cause

In seeking a new trial, Defendants argue that the Court was required to instruct the jury that the Government was required to prove beyond a reasonable doubt the absence of an intervening cause. Defendants cite no authority for this request and the Court has found none. Moreover, Defendants did not request such a charge and did not object to the charge that was given. *See* Proposed Jury Instructions, Zaekwon McDaniel, ECF No. 505; Tahjay Love, ECF No. 508. The jury was properly instructed that they must find beyond a reasonable doubt that the shooting of Lewis was the proximate cause of each death. Jury Instructions at 24–26, 33–34, 38–39. The proximate cause instruction included an instruction as to the impact of an intervening cause on the jury's determination, *id.* at 25–26, and the Defendants argued that Santos's driving and the resulting crash was such an intervening cause.

Notwithstanding, Defendants argue that the deficiency of the charge amounts to "manifest injustice" and requires a new trial. *Alston*, 899 F.3d at 146. The Court disagrees. The Court's instructions were legally correct; they advised the jury that the government must prove proximate cause beyond a reasonable doubt; they explained that an intervening cause would defeat a finding of proximate cause; they provided the parameters for Defendants to advance arguments premised on an intervening cause; which arguments were in fact made. Although not explicit, the jury was told that proximate cause must be proven beyond a reasonable doubt and that an intervening cause would defeat a finding of proximate cause. Therefore, the jury would have to find the *absence of an intervening cause* in order to convict. The motion for a new trial on this ground is denied.

### Count One—Conn. Gen. Stat. Sec. 53a-54(b)(7), Murder with Special Circumstances

Connecticut General Statutes Section 53a-54(b)(7) provides: "A person is guilty of murder with special circumstances who is convicted of any of the following and was eighteen years of age or older at the time of the offense: … (7) murder of two or more persons at the same time or in the course of a single transaction; …". "A single transaction is a series of events with a temporal continuity or clear connection." *State v. Gibbs,* 254 Conn. 578, 603 (2000). A "temporal nexus between multiple murders committed by a defendant may constitute evidence that those murders took place in the course of a single transaction." *Id.* at 606. And "at the same time" does not require the multiple deaths to occur simultaneously. *State v. Campbell,* 328 Conn. 444, 498 n.15 (2018). Such a temporal connection is not required, however. *Id.* Absent a sufficiently close temporal connection the murders must be "connected by a common purpose or plan in order to satisfy the statute's requirements." *Gibbs,* 254 Conn. at 601.

Defendants argue that there was neither a temporal nexus nor evidence of a common purpose or plan with respect to the murders of both Lewis and Santos. Again, Defendants' arguments are predicated on the factual assertion that Santos was not present when Lewis was shot; that he arrived on the scene sometime thereafter; and tried to help Lewis by driving him to the hospital when he then lost control of the vehicle resulting in the fatal crash. As such, the Defendants assert that there is neither a temporal nexus nor a common plan that can be attributed to the death of Santos. The fatal flaw with this argument is that, as discussed above, the evidence supported the inference that Santos was present when Lewis was shot; that the Volvo fled from the gunfire with both Lewis and Santos inside; and that within minutes the vehicle crashed, killing both Lewis and Santos. Under this construct, the jury could have easily concluded that this was "a series of events with a temporal continuity or clear connection." *Gibbs,* 254 Conn. at 603.

Further, Defendants advanced these arguments at trial and the jury was free to reject them, which it apparently did. As the Defendants make no claim that the jury was improperly instructed as to the elements of this statute, this argument fails.

### Constitutionality

Defendants also challenge § 53a-54(b)(7) as unconstitutionally vague, as applied. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "Thus, all vagueness challenges—whether facial or as-applied—require [courts] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006). Courts "are to evaluate constitutional vagueness challenges on the facts of the

22

given case and not on a speculative application of the statute." *United States v. Burden*, 600 F.3d 204, 228 (2d Cir. 2010).

"When the challenge is vagueness 'as-applied', there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Burke*, 449 F.3d at 486 (quoting *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.1993)).

As to the first inquiry, the Government charged, and argued, that Lewis and Santos were together at the Wendy's parking lot when Defendants began shooting. Both fled the scene in the Volvo, which crashed because, as posited by the Government, Lewis's injuries caused him to lose control of the vehicle. On these facts, a reasonable person would understand that this conduct— shooting at two people, causing them to flee, after which they both die—constitutes killing two people at the same time or in the course of the same transaction. And while case law, discussed above, has helped refine the parameters of "at the same time" or in "the course of a single transaction," those refinements do not render the statute vague as to the conduct alleged here.

The second inquiry requires courts to ask, "whether the law provides explicit standards for those who apply it." *Farrell* at 494. *"Courts considering as-applied vagueness challenges may determine either (1) that a statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." Id.*

The Court concludes that the statute, as written, does not risk arbitrary enforcement due to insufficiently clear standards. Indeed, murder is statutorily defined and "two or more persons" is self-explanatory. The additional qualifiers of "at the same time" and "in the course of the same transaction" are *in and of themselves standards* which provide the "minimal guidelines to law enforcement" necessary to withstand a vagueness challenge. *See United States v. Ng*, 2022 WL 1062704 (E.D.N.Y. April 8, 2022) (quoting *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010)). These limiting phrases cabin the scope of the statute when law enforcement arrests a person who has allegedly killed more than one person. Alternatively, as correctly noted by the Government, the conduct alleged in this case goes to the singular core of the statute—a prohibition against killing more than one person at the same time or in the course of a single transaction.

Further, the Court is mindful that the Connecticut Supreme Court concluded in *State v. Campbell* that the statute's use of the phrase "at the same time or in the course of the same transaction" did not render it unconstitutionally vague. *See* 328 Conn. at 495–502. Although factually distinct from *Campbell*, the conduct here involved the shooting of one person; flight from the gunfire by two persons; and a fatal crash shortly thereafter at which point both Lewis and Santos died, perhaps simultaneously. The events unfolded quickly from the moment Lewis was shot to the point when both Lewis and Santos died, seemingly bringing the Defendants' conduct squarely within the letter of the statute.

Finally, the Court observes that Defendants' vagueness argument is again predicated on the factual premise that Santos was not present when Lewis was shot. As discussed above, the jury could easily have concluded that Santos was present when the defendants began shooting and that he and Lewis fled the scene in the Volvo before crashing. The Court does not therefore consider Defendants' arguments regarding vagueness under this alternative factual scenario.

*Use of ATM Rap Videos*

In seeking a new trial, the Defendants also challenge the admission of rap videos made by rival gang members as impermissible hearsay. For example, in the "Still Geekin" video, Jermaine Smith Jr. taunts McDaniel. *See* GX 46. Gilbert testified as to the meaning of the lyrics and the ways in which they tended to embarrass McDaniel. Jan 18 Tr., PM, at 89:12–89:25; Jan. 19 Tr., AM, 16:7–21. Gilbert testified as to McDaniel's reaction to the video—he thought it was funny, but it also made him "tight" because the video "exposed him." *Id.* The Government used this evidence to argue McDaniel's motive to carry out acts of violence against ATM gang members. Feb. 8 Tr., PM, at 10:17–11:16. It is worth repeating that the evidence at trial included the shooting of Jermaine Smith Sr. by McDaniel and the shooting of Jermaine Smith, Jr. by other 960 members. *See*, *e.g.*, Jan. 19 Tr. at 112:7–125:15; Jan. 22 Tr., AM, at 30:2–42:21.

At trial, the videos were not offered or used for the truth of the lyrics, but for their effect on McDaniel individually and 960 generally. The lyrics were not hearsay.

No error occurred with respect to the ATM videos and certainly no manifest injustice resulted from their admission.

*Bayon—Joinder Prejudice*

Although conceding that he had insufficient basis upon which to seek severance under Rule 14, Bayon argues that his joinder with Love and McDaniel unfairly impacted his ability to put on a defense. This is because the evidence tending to support reasonable doubt as to his involvement in the Wendy's shootings would have implicated Love and McDaniel. At trial, having decided not to offer any evidence that would implicate his co-Defendants, Bayon instructed his attorneys not to elicit any such testimony or offer any such evidence.[14] Both his lawyers and the Court explained

---

[14] Co-Defendants McDaniel and Love, who may have been implicated, raised objections to the evidence and sought severance based upon the possibility of this evidence being offered. The Court denied those requests and determined

the perils of proceeding in this fashion and it was clear on the record that his decision was made against the advice of counsel. Bayon cannot now claim that he did not receive a fair trial because he could not argue freely without causing disadvantage to his co-defendants, because that was precisely the informed choice he made. Bayon cannot create a situation and then decry the fairness of that same situation. The motion for a new trial on this basis is denied.

*Love—Obstruction of Justice*

Love adopts the arguments advanced by co-defendant Graham as to both the applicability of the obstruction of justice statute as well as the sufficiency of the evidence. The Court has already rejected Graham's arguments by a memorandum of decision dated January 2, 2025. ECF No. 1142; *United States v. Graham*, No. 3:21-CR-00156 (KAD), 2025 WL 20525, at *6 (D. Conn. Jan. 2, 2025). For the reasons articulated therein, Love's motion as it pertains to Count 25 is denied. The sufficiency analysis as to the evidence against Graham overlaps considerably, if not entirely, with the analysis of that against Love. As to Love's knowledge of the federal grand jury investigation, the Court notes in addition to the evidence previously cited, that Love participated in the rap video called "Feds Watching" which, as noted, appears to relate directly to the then pending probe into 960 by the FBI. GX 44

**Conclusion**

The Motions for Judgment of Acquittal or in the Alternative for a New Trial are DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 15th day of April, 2025.

  */s/ Kari A. Dooley*
  KARI A. DOOLEY
  UNITED STATES DISTRICT JUDGE

---

that the use of the evidence by one defendant did not render the defenses sufficiently antagonistic to warrant severance. *See, e.g.*, Jan. 8 Trial Tr., PM, ECF No. 701 at 48:13–49:20; Feb. 6 Trial Tr., AM, ECF No. 738 at 50:9–53:19.